IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


OREGON NATURAL DESERT                    Civ No. 06-242-AA
ASSOCIATION,
                                         OPINION AND ORDER
        Plaintiff,

    v.


DANA SHUFORD, Burns District
Manager, BLM, KARLA BIRD,
Andrews Resource Area Field
Manager, JOAN M. SUTHER, Three
Rivers Resource Area Field
Manager, ELAINE M. BRONG, State
Director, Oregon/Washington
BLM, GALE A. NORTON, Secretary,
United States Department of the
Interior, U.S. BUREAU OF LAND
MANAGEMENT, and U.S. DEPARTMENT
OF THE INTERIOR,

        Defendants.
_____

Peter M. Lacy
Kristin F. Ruether
Oregon Natural Desert Association
917 SW Oak Street, Suite 408
Portland, Oregon 97205

Stephanie M. Parent
Pacific Environmental Advocacy Center
10015 SW Terwilliger Blvd.
Portland, Oregon 97219
    Attorneys for plaintiff


1 - OPINION AND ORDER

Karin J. Immergut
United States Attorney
District of Oregon
Stephen J. Odell
Assistant United States Attorney
1000 SW 3rd Ave, Suite 600
Portland, Oregon 97204

Bradley Grenham
Special Assistant US Attorney
Office of the Regional Solicitor
500 NE Multnomah Street, Suite 607
Portland, Oregon 97232
    Attorneys for defendants

Harold S. Shepherd
Center for Tribal Water Advocacy
P.O. Box 1637
Pendleton, Oregon 97801
    Attorney for Plaintiff-intervenor
    Center for Tribal Water Advocacy

Ronald Yockim
430 SE Main Street
P.O. Box 2456
Roseburg, Oregon 97470
    Attorney for amicus curiae Harney
    County

Elizabeth E. Howard
Dunn Carney Allen Higgins & Tongue LLP
851 SW Sixth Avenue, Suite 1500
Portland, Oregon 97204
    Attorney for amicus curiae Steens
    Mountain Landowner Group

AIKEN, Judge:

    Plaintiff Oregon Natural Desert Association (ONDA) filed suit

alleging that defendants violated federal environmental laws in a

number of respects in their adoption of the Andrews-Steens Resource

Management Plan.  Specifically, ONDA alleges that adoption of the

plan violated the National Environmental Policy Act (NEPA), 42

2 - OPINION AND ORDER

U.S.C. §§ 4321-4361; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701-1784; the Public Rangelands Improvement Act (PRIA), 43 U.S.C. §§ 1901-08; the Taylor Grazing Act of 1934 (TGA), 43 U.S.C. §§ 315-315r; and the Steens Mountain Cooperative Management and Protection Act of 2000 (the Steens Act), 16 U.S.C. § 460nnn et. seq., each actionable under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

On April 10, 2007, the court heard oral argument on plaintiff's motions for partial summary judgment on the Steens Act claim and for summary judgment on all other claims, plaintiff-intervenor's motion for summary judgment, and defendants' cross-motions for summary judgment. For the reasons set forth below, plaintiff's and plaintiff-intervenor's motions are granted as to plaintiff's Steens Act claim, and denied in all other respects. Defendants' cross motions for summary judgment are denied as to the Steens Act claim, and granted in all other respects.

## FACTUAL BACKGROUND

Steens Mountain is a nearly 10,000-foot elevation mountain in the northern Great Basin in southeast Oregon. In 2000, Congress enacted the Steens Act to provide for the management and conservation of Steens Mountain. Pub. L. 106-399, Oct. 30, 2000, 114 Stat. 1673. The Steens Act created the 17,000-acre Steens Mountain Wilderness Area; added 29 miles to the federal Wild and Scenic River System; withdrew 1.1 million acres from mining and

3 - OPINION AND ORDER

geothermal development; established the Wildlands Juniper
Management Area for experimentation, education, interpretation, and
demonstration of juniper management and restoration of native
vegetation; and designated the nation's first Redband Trout
Reserve. Id. The Steens Act also established the Cooperative
Management and Protection Area (CMPA) "to conserve, protect, and
manage the long-term ecological integrity of the Steens Mountain
for future and present generations." 16 U.S.C. § 460nnn-12(a).

The Bureau of Land Management (BLM) manages 3,275,694 acres of
public land in the Burns District where Steens Mountain is located.
The Burns District is divided into two Resource Areas (RAs): the
Andrews RA and the Three Rivers RA. The two RAs are further
divided into land within the boundary of the 428,000-acre CMPA, and
land within the Andrews RA but outside the CMPA boundary. The
latter is called the Andrews Management Unit (AMU) and covers over
1,221,000 acres of land.

The Steens Act directed BLM to prepare a management plan for
the CMPA no later than October 30, 2004. Id. § 460nnn-21(b). In
2001 BLM began preparing two counterpart Resource Management Plans
to govern BLM's management of approximately 1.6 million acres of
public land within both the CMPA and the AMU, collectively called
as the Andrews-Steens Resource Management Plan (Andrews-Steens
RMP). The planning area includes all or portions of twenty-three
designated Wilderness Study Areas covering almost 680,000 acres.

During the planning process, ONDA met with BLM staff, submitted scientific data and literature, and provided detailed written comments regarding fish and wildlife values and potential wilderness preservation. ONDA independently surveyed more than 750,000 acres of public land, utilizing BLM inventory protocol established in the BLM's 2001 *Wilderness Inventory Study and Procedures* handbook, and submitted to BLM a detailed 2,000-plus page wilderness inventory for the Andrews-Steens planning area. ONDA's wilderness inventory includes maps identifying areas that ONDA believes have wilderness characteristics, annotated road and photo logs with GPS locations, thousands of photographs, and narratives documenting ONDA's analysis of wilderness characteristics not included in BLM's original wilderness review. AR 20655-22899. ONDA also provided BLM with road closure recommendations accompanied by photographs, maps, and narrative descriptions.

Pursuant to NEPA requirements, BLM released a Draft RMP/Draft Environmental Impact Statement (EIS) in October 2003, and a Proposed RMP/Final EIS in August 2004. On September 9, 2004, ONDA administratively protested the Andrews-Steens Proposed RMP and Final EIS. 43 C.F.R. § 1610.5-2. On June 10, 2005, BLM denied ONDA's protest in a letter responding to ONDA's protest issues. On July 15, 2005, BLM issued a Record of Decision (ROD) adopting the Andrews-Steens RMP.

5 - OPINION AND ORDER

On February 22, 2006, ONDA filed the present lawsuit. ONDA alleges that, in adopting the Andrews-Steens RMP, BLM failed to: (1) consider the environmental consequences of the RMP on wilderness resources; (2) develop and maintain an accurate wilderness inventory in order to balance multiple uses and ensure that the proposed action will not cause "unnecessary or undue degradation" to the public lands; (3) analyze a reasonable range of alternatives with respect to domestic livestock grazing and off-highway vehicle use; (4) assess or determine the suitability of the public lands for grazing; and (5) adopt, as an integral part of the RMP, a comprehensive transportation plan as required under the Steens Act.

### STANDARDS OF REVIEW

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where, as here, the district court is reviewing an administrative record pursuant to the APA, summary judgment is appropriate for deciding the legal issue of whether an agency could reasonably have found the facts as it did. Occidental Eng'g Co. v. Immigration and Naturalization Serv., 753 F.2d 766, 769-70 (9th Cir. 1985).

Under § 706(1) of the APA, a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A plaintiff may challenge an agency's failure to act under § 706(1)

only "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 64 (2004) ("SUWA") (emphasis in original); Center for Biol. Diversity v. Veneman, 394 F.3d 1108, 1113 (9th Cir. 2005).

Alternatively, where an agency has taken final action, a court may set aside that action under § 706(2)(A) of the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377 (1989). Review under the arbitrary and capricious standard is narrow, and courts give deference to an agency's construction of a statutory provision it is charged with administering. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43 (1983); American Fed'n of Gov't Employees v. Fed. Labor Relations Auth., 204 F.3d 1272, 1274-75 (9th Cir. 2000).

The reviewing court must determine whether the agency's decision was based on a consideration of the relevant factors or whether there has been a clear error of judgment. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; Hells Canyon Alliance v. United States Forest Serv., 227 F.3d 1170, 1177 (9th Cir. 2000). For example, the court may set aside a decision if the agency has relied "factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43; <u>Pacific Coast Fed. of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.</u>, 265 F.3d 1028, 1034 (9th Cir. 2001). Thus, the reviewing court's inquiry, though narrow, must be "searching and careful." <u>Ninilchik Traditional Council v. United States</u>, 227 F.3d 1186, 1194 (9th Cir. 2000) (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971)).

Further, "[d]eference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters." <u>United States v. Alpine Land & Reservoir Co.</u>, 887 F.2d 207, 213 (9th Cir. 1989). However, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned." <u>Greenpeace v. Nat'l Marine Fisheries Serv.</u>, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).

## DISCUSSION

ONDA's claims fall into four broad categories: (1) wilderness claims; (2) range of alternatives claims; (3) grazing suitability and "chiefly valuable" claims; and (4) transportation plan claims.

## I. Wilderness Claims

ONDA's primary challenge to the Andrews-Steens RMP is that BLM

did not adequately consider the effects of the RMP on wilderness resources. First, ONDA alleges that BLM violated NEPA by relying on an outdated and inaccurate wilderness inventory, thus failing to take a "hard look" at the RMP's likely impacts on wilderness. <u>See</u> 42 U.S.C. § 4332(2)(C). Second, ONDA alleges that BLM violated FLPMA by failing to maintain a current wilderness inventory in order to balance wilderness resources against other "multiple uses" of the public land and ensure its actions will not cause "unnecessary or undue degradation" of the lands. <u>See</u> 43 U.S.C. § 1732(a),(b).

A. <u>Wilderness Inventory Requirements Under NEPA and FLPMA</u>

NEPA and FLPMA impose distinct duties that agencies must follow in preparing and implementing land use plans.

NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions. 42 U.S.C. § 4332; <u>Baltimore Gas & Elec. Co. v. Natural Res. Def. Council</u>, 462 U.S. 87, 97 (1983). The statute's dual objectives are to ensure that agencies "consider every significant aspect of the environmental impact of a proposed action" and to "inform the public that it has indeed considered environmental concerns in its decision making process." <u>Earth Island Inst. v. United States Forest Serv.</u>, 442 F.3d 1147, 1153-54 (9th Cir. 2006) (quoting <u>Kern v. United States Bureau of Land Mgmt.</u>, 284 F.3d 1062, 1066 (9th Cir. 2002)). Thus, "NEPA procedures must insure that environmental information is

9 - OPINION AND ORDER

available to public officials and citizens before decisions are made and before actions are taken . . . [a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).

To this end, federal agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  Initially, an agency prepares a draft EIS in which it evaluates the proposed action and its direct, indirect, and cumulative environmental impacts, and compares the proposed action with reasonable alternatives, including a "no action" alternative.  40 C.F.R. § 1502.14.  After circulating the draft EIS for public review and comment, the agency reviews and responds to comments, makes changes to the draft EIS, and circulates a final EIS.  Id. §§ 1502.19, 1503.1, 1503.4.  The agency then issues a ROD adopting a particular alternative.  Id. § 1505.2.

An EIS must contain a "full and fair discussion" of significant environmental impacts that is "supported by evidence that the agency has made the necessary environmental analyses."  40 C.F.R. § 1502.1.  In other words, NEPA requires that the agency take a "hard look" at the environmental consequences of the proposed action.  E.g., Ocean Advocates v. United States Army Corps of Eng'rs, 402 F.3d 846, 864 (9th Cir. 2005); Idaho Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002) (quoting

<u>Marsh</u>, 490 U.S. at 374).   NEPA does not contain an explicit requirement that an agency inventory wilderness characteristics on the affected land for each proposed action.   Rather, any requirement that an agency possess accurate wilderness information is implicit in NEPA's "hard look" requirement.

To comply with NEPA's "hard look" mandate, courts have held that agencies are obligated to maintain a current inventory of resources so that an adequate baseline exists to evaluate the environmental impacts of a proposed action.  <u>Center for Biol. Diversity v. Bureau of Land Mgmt.</u>, 422 F. Supp. 2d 1115, 1163 (N.D. Cal. 2006) ("<u>CBD</u>"); <u>see also</u> <u>Oregon Natural Desert Ass'n v. Rasmussen</u>, 451 F. Supp. 2d. 1202, 1212-13 (D. Or. 2006).   The environmental baseline is an integral part of an EIS, because it is against this information that environmental impacts are measured and evaluated; therefore, it is critical that the baseline be accurate and complete.  <u>American Rivers v. Fed. Energy Regulatory Comm'n</u>, 201 F.3d 1186, 1195 & n.15 (9th Cir. 2000); <u>CBD</u>, 422 F. Supp. 2d at 1163.  However, NEPA does not specify the "quantum of information" an agency must possess about wilderness or any other resource before the agency may proceed with a given project, and the information available to an agency can always be augmented. <u>Alaska v. Andrus</u>, 580 F.2d 465, 473 (D.C. Cir. 1978), <u>vacated in part on other grounds</u>, <u>Western Oil & Gas Ass'n v. Alaska</u>, 439 U.S. 922 (1978).

11 - OPINION AND ORDER

In contrast, FLPMA prescribes a substantive wilderness inventory requirement stemming from its "policy in favor of retaining public lands for multiple use management," SUWA, 542 U.S. at 57 (quoting Lujan v. Nat'l Wildlife Fed'n., 497 U.S. 871, 877 (1990)), and "sustained yield." 43 U.S.C. § 1702(h). Multiple use management requires BLM to balance many competing uses, "including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." 43 U.S.C. § 1702(c); SUWA, 542 U.S. at 57. Wilderness preservation is part of BLM's multiple-use mandate, and wilderness is recognized as a resource value considered in the land use planning process. See 43 U.S.C. § 1701(a)(8); AR 0685, 26537.

To meet FLPMA's multiple-use and sustainable-yield mandates, FLPMA establishes a dual regime of inventory and planning. SUWA, 542 U.S. at 58. FLPMA requires that BLM "prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values . . . giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). Further, BLM's inventory "shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." Id.; see also id. § 1701(a)(2) ("the national interest will be best realized if the public lands and their resources are periodically and systematically inventoried").

Pursuant to FLPMA, BLM was required to complete, by 1991, a

wilderness inventory of lands over 5,000 acres and identify those areas that have wilderness characteristics - known as Wilderness Study Areas (WSAs) - and to recommend to Congress whether such WSAs should be preserved as wilderness. Id. § 1782(a). Accordingly, BLM issued an *Oregon Wilderness Final EIS* in 1989 and a *Wilderness Study Report* in 1991 that included wilderness area recommendations. Until Congress acts on BLM's recommendations, the WSAs must be managed so that their wilderness suitability is not impaired. Id. § 1782(c).

Based on its ongoing inventory of resources, BLM must also "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a); see also id. § 1712(c) (criteria for development and revision of land use plans; 43 C.F.R. § 1610.4-3 (BLM's implementing regulations for inventory data and information collection). Generally, an RMP is a land use plan that establishes allowable uses, land designations, goals for future conditions of the land, program constraints and management practices, implementation requirements, monitoring and evaluation standards, and specific steps for management of the lands. 43 U.S.C. § 1712; 43 C.F.R. § 1601.0-5(n). RMPs are intended to provide long-term, broad direction to the agency in managing public lands. In preparing an RMP, BLM must rely on its inventory of public lands and included resources. 43 U.S.C. § 1712(c)(4).

13 - OPINION AND ORDER

In sum, neither NEPA nor FLPMA require that BLM perform a new wilderness inventory each time BLM develops an RMP, so long as BLM utilizes an adequate environmental baseline of resources in its NEPA analysis and considers all information on the public land resources in balancing uses for multiple-use and sustained-yield under FLPMA.

     B.   NEPA Wilderness Claims

ONDA alleges that BLM failed, in several respects, to adequately consider environmental impacts of the Andrews-Steens RMP on wilderness resources.  At the outset, I note that judicial review of NEPA claims is limited.  "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision was not arbitrary or capricious."  Baltimore Gas & Elec. Co., 462 U.S. at 97-98.  Accordingly, "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of action to be taken.'"  Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227-28 (1980) (quoting Kleppe v. Sierra Club, 427 U.S. 390, 740 n.21 (1976)); see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558 (1978) ("Administrative decisions should be set aside . . . only for

substantial procedural or substantive reasons as mandated by statute, . . . not simply because the court is unhappy with the result reached.").

First, ONDA argues that BLM failed to take a "hard look" at the impact of the Andrews-Steens RMP on wilderness resources covering more than 800,000 acres of public land, because BLM relied on an outdated and inaccurate wilderness inventory.  ONDA asserts that since the 1970s, BLM has not inventoried wilderness values or considered whether the lands in the Andrews-Steens RMP area possess wilderness characteristics.  ONDA further maintains that BLM failed to identify parcels of land that contain wilderness characteristics and should have been considered in the wilderness resource inventory as part of the environmental "baseline" for NEPA analysis.

BLM does not dispute that it conducted an initial wilderness inventory in the 1970s.  However, BLM asserts that it updated this inventory in its 1991 *Wilderness Study Report for Oregon*.  Further, BLM argues that the wilderness inventory was updated during the RMP process by reviewing ONDA's wilderness recommendations and independently reviewing potential wilderness characteristics of several parcels acquired by BLM after 1991.

As supporting authority for its position, ONDA cites Rasmussen, in which this court found that BLM violated NEPA by relying on a 1992 wilderness inventory when evaluating the impacts

15 - OPINION AND ORDER

of implementing an environmental assessment.    451 F. Supp. 2d at
1213.    In Rasmussen, as here, ONDA asserted that BLM's wilderness
inventory was outdated and inaccurate and submitted its own
wilderness inventory to BLM during the NEPA review process.    Id. at
1211.  There, however, BLM wholehandedly dismissed ONDA's inventory
and found it "incomplete and/or inaccurate."    Id. at 1212.    The
court thus held that BLM could not meet its obligation under NEPA
by simply "reviewing and critiquing ONDA's work product"; rather,
BLM was obligated to "consider whether there were changes in or
additions to the wilderness values" and "whether the proposed
action in that area might negatively impact those wilderness
values, if they exist."  Id. at 1213.

        The facts of this case are distinguishable from Rasmussen.
Though BLM admits it relied primarily on a comprehensive wilderness
review and WSA designation process conducted prior to 1991, BLM
also reviewed the substance of ONDA's proposed wilderness areas, as
well as wilderness resources beyond those ONDA proposed.  According
to BLM, an interdisciplinary team of experts undertook the
wilderness evaluations in team meetings and documented its review
in a "Citizen Proposal Evaluation Form."  This form recorded
whether the proposed area met minimum acre requirements for
wilderness, whether changes had occurred in the area that affected
"naturalness," whether the area appeared to meet the definition of
naturalness, and whether the area contained outstanding

opportunities for primitive and unconfined recreation. <u>See, e.g.,</u> AR 02869-2870, 02872, 02874, 06635, 06688-06690. Based on these criteria, the interdisciplinary team evaluated existing information and information submitted by ONDA. AR 26648.

Thus, unlike <u>Rasmussen</u>, the record shows that BLM evaluated ONDA's proposed WSAs and identified one parcel, the Alvord Desert Addition, as having wilderness characteristics. AR 26648. BLM also included three additional parcels that were acquired by BLM after the original inventory and were not included in ONDA's proposed wilderness inventory.[1] At the same time, BLM determined that the other parcels proposed by ONDA did not possess the required characteristics of "wilderness" and did not further analyze those parcels in the EIS. AR 17416. For example, ONDA asserted that the "Table Mountain Proposed WSA Addition" should have been included as part of the baseline wilderness resource in BLM's environmental analysis. However, BLM disagreed, finding that the area did not possess sufficient wilderness characteristics to be included as part of the baseline wilderness resource. AR 02966.

In sum, I find that BLM considered the WSAs proposed by ONDA, as well as areas not proposed by ONDA. Notably, NEPA does not require that BLM designate wilderness study areas when considering the impacts of an agency action. Rather, it is sufficient that BLM

---

[1]The three parcels are Bridge Creek (1,526 acres), High Steens (629 acres), and Lower Stonehouse (2,176 acres). AR 26648.

considered additional parcels as wilderness resources and other
resources in the planning area; NEPA does not require that BLM
reach a particular substantive outcome, and this court cannot
substitute its judgment for that of the agency. See, e.g.,
Strycker's Bay, 444 U.S. at 227-28. Therefore, I find that BLM had
an adequate environmental baseline and took the requisite "hard
look" at the RMP's effects on wilderness resources.

Second, ONDA argues that the EIS should have included BLM's
analysis of ONDA's proposed WSAs so that the public could review
BLM's assessment. Plaintiff relies on CBD, where the district
court found that BLM violated NEPA where it ignored obviously-
present species in its assessment of environmental impacts. 422 F.
Supp. 2d at 1163. Given the facts of this case, I find that BLM
did not violate NEPA by omitting from the EIS the discussion of
areas which it found to have no wilderness characteristics.

Unlike CBD, the record here is not "replete with evidence"
that BLM ignored existing wilderness resources. Instead, BLM has
pointed to evidence in the record reflecting that it considered
ONDA's proposed WSAs and found the areas did not qualify as
wilderness in most instances. See, e.g., Hells Canyon Alliance,
227 F.3d at 1184 (explaining an agency is entitled to rely on its
own expertise in its method for analysis). Because BLM considered
additional wilderness resources, and in fact added wilderness areas
to that inventory, BLM has the authority to reject ONDA's inventory

without discussing its analysis of those parcels that BLM found did not include wilderness characteristics. See Mid States Coal. for Progress v. Surface Transp. Bd., 345 F.3d 520, 548 (8th Cir. 2003) ("NEPA does not require an additional round of public comments every time an agency revises, supplements, or improves its analysis in response to the public comments").

Next, ONDA argues that BLM's analysis of the wilderness resource was arbitrary and capricious, because BLM relied on inaccurate data regarding the presence of roads. In the RMP, BLM designates roads and routes as open or closed and what levels of maintenance they will receive. See AR 27907-27908, 27890-92.

During BLM's planning process, ONDA inventoried 655 miles of routes and submitted to BLM detailed road closure recommendations. AR 5511-5523. ONDA asserted that many of the routes considered by the BLM to be "roads" are actually unmaintained, overgrown, often impassable "ways," and submitted to BLM photographic evidence suggesting some routes were misclassified as roads and should be closed. The distinction between "roads" and "ways" for the purposes of wilderness is significant because the definition of wilderness generally mean that the parcel is roadless. See 16 U.S.C. § 1131.[2] ONDA also alleges that BLM did not analyze the

_____

[2]For example, BLM's wilderness policy states that "a way maintained solely by the passage of vehicles does not constitute a road," even if it is used on a regular and continuous basis. AR 0690-0692.

19 - OPINION AND ORDER

impacts to wilderness values by keeping routes/roads open.

As discussed previously, BLM only has to consider an adequate baseline of resource information to satisfy NEPA's "hard look" requirement, and BLM can rely on its expertise to determine whether a parcel has the requisite wilderness characteristics, including the presence or absence of roads.  Through its designations, BLM did not ignore obviously-present wilderness characteristics, and it is under no obligation to agree with ONDA's assessment of routes. See CBD, 422 F. Supp. 2d at 1163.  NEPA is a procedural statute and does not mandate particular results.  See, e.g., Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989) ("NEPA merely prohibits uninformed – rather than unwise – agency action."); Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1070 (9th Cir. 2002).  Thus, in a factual situation where it is debatable whether a route is a "road" or a "way," the court cannot substitute its judgment for that of BLM.

Finally, in addition to the arguments above, plaintiff-intervenor Center for Tribal Water Advocacy ("CTWA") argues that BLM violated NEPA by failing to analyze the cumulative environmental impacts of the Andrews-Steens RMP, because BLM allegedly deferred this assessment to later site-specific plans.[3]

---

[3]In its complaint, ONDA also alleges that BLM failed to assess cumulative impacts in its complaint.  However, ONDA does not discuss this claim in its briefs, and therefore I consider it waived.

See 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.25(a)(2) (an EIS must include an analysis of the likely cumulative impacts of proposed actions).

CTWA's cumulative impacts claim also fails. The EIS contains a discussion of cumulative impacts in the context of 23 primary categories of resources or uses that are the focus of the RMP. See, e.g., AR 26660, 26674-26675, 26684. In addition, an RMP is a general management plan, and the EIS for the RMP must predict cumulative effects of the plan across nearly 1.7 million acres for up to 20 years. AR 26269-26270. The RMP does not dictate site-specific actions, and therefore BLM is not able, nor is required, to assess the impacts of its management activities to the level of detail CTWA prefers.

C. FLPMA Wilderness Claims

In addition to its NEPA wilderness claim, ONDA argues that, by having no accurate wilderness or route inventory, BLM had no basis for balancing multiple uses, nor did it have a basis to determine whether the proposed uses analyzed in the EIS would cause unnecessary or undue degradation to wilderness resources. Thus, ONDA alleges that BLM violated FLPMA's requirements that BLM manage for "multiple use and sustained yield" and "take any action necessary to prevent unnecessary or undue degradation of the lands." See 43 U.S.C. §§ 1712(c)(1), 1732(a),(b).

In response, BLM argues that the Supreme Court's decision in

SUWA bars this claim, because FLPMA imposes no discrete, mandatory duty on BLM to update its inventory.  In SUWA, the Supreme Court held that a claim under § 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take," a limitation that precludes a "broad programmatic attack" against an agency.  542 U.S. at 64 (emphasis in original).  As examples, the Court noted that allegations that an agency "fail[ed] to revise land use plans in proper fashion" and "fail[ed] to consider multiple use" are properly categorized as agency action "not in accordance with law" under § 706(2), rather than "agency action unlawfully withheld." Id. at 65.  Further, "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."  Id.

Thus, BLM argues that SUWA bars ONDA's FLPMA wilderness inventory claim, because the statute grants the agency wide discretion to determine when and how to maintain resource inventories, and BLM's efforts to maintain its inventories is simply not a "final agency action" reviewable under the APA.

I agree that SUWA bars ONDA's FLPMA wilderness claims under § 706(1) of the APA, because BLM has maintained an wilderness inventory and has broad discretion in managing public lands for multiple use.  Thus, there is no absolute failure to perform a

mandatory act.  However, ONDA also brings a claim under § 706(2)(A) of the APA to set aside final agency action that is arbitrary, capricious, or not in accordance with law.  Agency approval of an RMP is a final agency action that may be challenged under § 706(2)(A).  See Klamath Siskiyou Wildlands Ctr. v. Boody, 468 F.3d 549, 561 (9th Cir. 2006) ("[A]n agency action is completed when a land use plan is approved."); Soda Mountain Wilderness Council v. Norton, 424 F. Supp. 2d 1241, 1259-60 (E.D. Cal. 2006) ("Soda Mountain").  Accordingly, SUWA does not preclude ONDA's FLPMA wilderness claims brought under § 706(2)(A) of the APA.

ONDA argues that BLM's adoption of the RMP was arbitrary and capricious, because BLM had no basis for balancing multiple uses nor determining whether proposed uses would cause unnecessary or undue degradation to wilderness values.  ONDA argues that it is undisputed that BLM did not maintain a current inventory of wilderness in the RMP area and cites its own inventory that identifies lands with significant wilderness values not included in BLM's inventory.

BLM disputes that its wilderness inventory is not current, noting that BLM documented its comprehensive inventory of all of the areas at issue in its 1989 *Oregon Final Wilderness EIS* (AR 18014) and its 1991 *Wilderness Study Report for Oregon* (AR 18889).  BLM maintains that this inventory provides a baseline for BLM's review of subsequent information, and that BLM has since gathered

additional information on the changes to the planning area, such as fences, roads, and other developments.

In support of its argument, ONDA relies on CBD and Soda Mountain. As discussed above, in CBD the district court ruled that BLM violated FLPMA by failing to update its wilderness inventory to include several species of endemic invertebrates. 422 F. Supp. 2d at 1167-68. CBD is distinguishable because there was ample evidence that the species existed in the project area, and BLM chose to ignore that wilderness "resource" in its RMP.

> [T]he problem here is not that the BLM did not update the inventory data so that it was exhaustive and current; to the contrary, the problem lies with the fact that, despite extensive evidence in the record indicating the existence of numerous other species found at the [project area], . . . BLM nevertheless approved the [RMP] which does not take these species into consideration.

Id. at 1167. Thus, CBD holds that BLM cannot ignore an obviously-present wilderness resource, not that BLM is required to agree with ONDA's findings of wilderness characteristics. As discussed, ONDA presents no evidence that BLM ignored existing wilderness resources. Rather, the record shows BLM considered ONDA's wilderness proposals and added several parcels to its wilderness inventory.

Similarly, ONDA's argument is not supported by Soda Mountain. In Soda Mountain, the plaintiffs argued that an environmental assessment permitting livestock grazing even though the RMP prohibited livestock grazing unless it "would be beneficial to

24 - OPINION AND ORDER

enhance wildlife habitat" was an internal contradiction that failed to draw rational connections between the facts found and the decisions made. 424 F. Supp. 2d at 1269-70. The plaintiffs maintained that BLM failed to explain why grazing would be beneficial and permitted in some areas of the RMP, but not in the rest of the project area that had the same ecological properties. Id. at 1270. BLM failed to respond to the specific contradictions in the management plan, and the court found that BLM was required to undertake a "more considered, transparent, and in-depth review of the potential environmental impacts" of the proposed action. Id. at 1271.

Unlike Soda Mountain, ONDA does not point to particular evidence or contradictions in the RMP that suggest BLM is failing to manage for multiple use and prevent undue degradation. Further, ONDA does not allege that BLM has failed to analyze whether actions proposed in the RMP will cause unnecessary degradation of public lands. Soda Mountain, 424 F. Supp. 2d at 1270. Instead, ONDA claims that BLM, by relying on an inaccurate wilderness inventory, had no baseline upon which to balance competing uses evaluate and prevent potential degradation. However, FLPMA imposes broad and general management goals rather than procedural or substantive requirements for BLM.

In sum, ONDA has not shown that BLM's baseline information for wilderness was outdated or inaccurate to the point that the agency

25 - OPINION AND ORDER

did not meet FLPMA's requirements of managing for multiple use and preventing unnecessary or undue degradation. The record demonstrates that BLM considered ONDA's wilderness inventory and agreed that one parcel possessed the requisite wilderness characteristics. In addition, BLM added several other parcels to its wilderness inventory, reflecting that some level of updating occurred during the RMP process. Even if BLM excluded parcels that ONDA believes have wilderness characteristics, BLM has wide discretion in conducting its wilderness analysis and need not agree with ONDA's assessment. This court will defer to the agency's expertise in this regard, absent a showing that BLM failed to analyze the RMP's impact on an obviously-present resource value. See <u>CBD</u>, 422 F. Supp. 2d at 1167-68. Accordingly, ONDA cannot prevail on its FLPMA wilderness claims.

## II. Range of Alternatives Claims

ONDA alleges that BLM violated NEPA by failing to consider an adequate range of alternatives regarding lands allocated for grazing and lands closed to off-highway vehicle (OHV) use. Specifically, ONDA argues that BLM should have considered at least one alternative that would decrease the overall land allocated to grazing in the RMP area. Similarly, ONDA alleges that BLM failed to consider an adequate range of lands designated as "closed" to off-highway vehicle use.

NEPA requires agencies to consider reasonable alternatives to

the proposed action in an EIS.    42 U.S.C. § 4332(2)(C)(iii).

NEPA's alternatives requirement forms the "heart of the environmental impact statement" and agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14.  Accordingly, NEPA requires federal agencies, to the fullest extent possible, to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).

To determine whether the range of alternatives is sufficient, courts examine the purpose and need of projects on a case-specific basis.  City by Carmel-by-the Sea v. United States Dept. of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997).  In particular, the Ninth Circuit employs a "'rule of reason' standard of review that inquires whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of a proposed action.  'Ilio'ulaokalani Coal. v. Rumsfeld, 464 F.3d 1083, 1094 (9th Cir. 2005) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)).  This standard requires an agency to look at reasonable alternatives "within the range dictated by the nature and scope of the proposed action," but only requires consideration of those alternatives "necessary to permit a reasoned choice." Northwest Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1538 (9th Cir. 1997) (citations

omitted).   An agency's failure to examine a viable alternative renders an EIS inadequate.   Muckleshoot Indian Tribe v. United States Forest Serv., 177 F.3d 800, 814 (9th Cir. 1999).

In the EIS, BLM considered five grazing alternatives.   AR 26453-26456.   Under Alternative B, livestock grazing would be eliminated from all public lands in the RMP planning area.[4]   The other four alternatives include various levels of grazing within land currently allocated for grazing, totaling approximately 3,000 acres.   Specifically, Alternative E would increase grazing beyond what is currently allowed, while Alternatives A, C, and D propose grazing levels between Alternative E (increased grazing) and Alternative B (no grazing).[5]

ONDA argues that BLM violated NEPA by not considering an alternative that reduces the amount of land allocated to grazing, with the exception of Alternative B, and by examining only the levels of grazing permitted on such land.   ONDA emphasizes that grazing alternatives at the RMP stage are critical, because the RMP implements threshold decisions regarding the amount of land that

--------

[4]Because the Steens Act mandates that grazing be authorized in some of the RMP area, see 16 U.S.C. § 460nnn-21, Alternative B is contrary to congressional intent.

[5]Currently, the authorized level of grazing is up to 60% on nonnative seedlings and 50% on native herbaceous forage plants, unless lower levels are necessary to protect sage grouse habitat. AR 26454.  Alternative E would increase grazing up to 60% on herbaceous plants in both uplands and nonnative seedlings.  AR 26454-26455.

will be allocated to grazing, on which later site-specific decisions are based.

The court's analysis begins with an examination of the purpose and need for the RMP and its goals and objectives. <u>City by Carmel-by-the Sea</u>, 123 F.3d at 1155. The Andrews-Steens RMP is a twenty-year plan governing 1,221,314 acres of public land. RMP, p. 1 ("Purpose and Need" section). A stated purpose of the RMP is to provide a "comprehensive framework" for managing public lands within the Andrews RA and the CMPA, thus meeting "the requirements of [FLPMA] . . . which mandates public land be managed for multiple use and sustained yield," as well as the purpose of the Steens Act to provide long-range protection of the lands within the CMPA. RMP, pp. 1-2. Under FLPMA and the Steens Act, BLM has an obligation to manage public lands to permit sustained levels of grazing and implement administrative solutions and rangeland projects. Nonetheless, the RMP recognizes:

> Where livestock grazing is found to limit achievement of standards and multiple use objectives, management changes would be required in order to meet habitat and other resource objectives. . . . Wherever existing grazing management practices on public land are determined to be contributing to non-attainment of standards and other resource objectives, appropriate actions would be implemented.

AR 26543. Accordingly, the goals, objectives, and actions established by the RMP are intended to promote a sustained level of livestock grazing and other uses while maintaining healthy public land resources.

29 - OPINION AND ORDER

ONDA raised similar objections to an RMP-level EIS in Rasmussen, arguing that BLM failed to consider an adequate range of alternatives because it did not consider reducing livestock grazing or increasing livestock herding. 451 F. Supp. 2d at 1213. The court found that BLM was not required to consider alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." Id. at 1214 (citation omitted). Because BLM was required to "provide a predictable sustained flow of economic benefits within the capability of the planning area ecosystem," the court held that the proposed alternatives were not consistent with the overall management policy of the area and that BLM's choice of alternatives were reasonably intended to achieve the purpose of the RMP. Id.

I find that the analysis in Rasmussen applies here. Given the purpose and goals of the Andrews-Steens RMP, BLM has not violated NEPA by failing to consider an alternative that would reduce the lands allocated for grazing, because such an alternative is not feasible or consistent with BLM's management duties. Notably, the Steens Act designated 94,959 acres as No Livestock Grazing Area; at the same time, BLM must manage the planning area so as to provide a sustained level of livestock grazing. Thus, BLM is not required to consider alternative levels of grazing which it deems outside the goals articulated in the RMP. ONDA has not identified a viable alternative that reduces land allocated to grazing but meets the

30 - OPINION AND ORDER

purposes of the RMP, including its grazing objectives.

Next, ONDA disputes the method by which BLM calculated alternative grazing levels within the lands allocated for grazing. In analyzing alternatives, BLM compared forage levels allocated to domestic livestock as measured by "use percentages," rather than by "Animal Unit Months" (AUMs).[6]  BLM asserts that it will make AUM decisions in subsequent, site-specific allotment management plans. ONDA argues that AUM decisions are required at the RMP stage, and that BLM cannot defer its consideration of the environmental effects of various AUM levels by promising to consider impacts during future allotment management plans.  See Kern v. United States Bureau of Land Mgmt., 284 F.3d 1062, 1072 (9th Cir. 2002) ("If an agency were able to defer analysis discussion of environmental consequences in an RMP, based on a promise to perform a comparable analysis in connection with later site-specific projects, no environmental consequences would ever need to be addressed in an EIS at the RMP level . . . .").

ONDA raised a similar argument in Oregon Natural Desert Ass'n v. Bureau of Land Mgmt., 2005 WL 711663 (D. Or. Mar. 29, 2005). There, ONDA alleged that BLM failed to consider reducing grazing levels as measured in AUMs, because BLM chose to maintain the current grazing levels "until analysis or evaluation through the

_____

[6] An AUM is the amount of forage necessary to sustain one cow for one month.  43 C.F.R. § 4100.0-5.

adaptive management process identifies a need for adjustments to meet objectives." Id. *2. The court, in a brief opinion, held that BLM considered an adequate range of grazing level alternatives and noted that the RMP could not be expected to address specific issues in detail because it was a comprehensive plan managing the use of 4.6 million acres over twenty years. Id. at *3.

I find this reasoning persuasive as applied to the Andrews-Steens RMP. It is not feasible for BLM to assess the environmental impacts of various alternatives based on site-specific AUM levels across 1,221,314 acres of land over a twenty-year period. While it is true that BLM cannot defer analysis of environmental consequences in an RMP based on a promise to perform comparable analysis in later site-specific projects, Kern, 284 F.3d at 1072, NEPA does not require that BLM employ a particular method of calculating grazing levels. It is enough that BLM assessed five alternatives considering a range of grazing levels and their impacts within the RMP planning area, ranging from no use, status quo, use above the status quo, and a minimum level of grazing. Based on the mandates of the Steens Act and the goals articulated in the Purpose and Need section of the RMP, I find that BLM considered a reasonable range of grazing alternatives.

Finally, ONDA argues that BLM failed to consider a reasonable range of alternatives with respect to lands designated as closed to OHV use. Specifically, ONDA argues that BLM impermissibly narrowed

the range of alternatives by excluding an alternative that would close OHV use in areas that ONDA has identified as having wilderness characteristics.

Like grazing alternatives, designation of OHV use on public lands occurs at the RMP level, and BLM may designate areas as "open," "limited," or "closed" to OHV use.  See 43 C.F.R. §§ 8340.0-1, 8342.2.  In its EIS, BLM considered five alternatives addressing OHV use, including a mix of closures and limited use designations, two of which would have eliminated OHV use.  AR 26475-26480.  Though BLM considered one alternative that prohibited OHV use over a substantial amount of public land within WSAs, this alternative did not include closing OHV use within areas that ONDA argues possess wilderness characteristics.

As discussed above, BLM is not required to adopt ONDA's wilderness inventory, and ONDA identifies no other deficiency in BLM's range of alternatives regarding OHV use.  Further, BLM considered a reasonable range of closed and limited road designations.  Therefore, I find no NEPA violation.

## III.  Grazing Suitability and "Chiefly Valuable" Claims

ONDA argues that BLM failed to adequately consider grazing allocations in the Andrews-Steens RMP in violation of the Public Rangelands Improvement Act (PRIA), the Taylor Grazing Act (TGA), and FLPMA.

First, ONDA argues that BLM failed to consider the suitability

33 - OPINION AND ORDER

of the public lands for continued domestic grazing, in violation of the PRIA and FLPMA.  ONDA maintains that BLM must determine the suitability of land allocated for grazing under PRIA's requirement that BLM "update, develop (when necessary) and maintain on a continuing basis thereafter, an inventory of range conditions and record of trends of range conditions on the public rangelands."  43 U.S.C. § 1903(a).  Likewise, ONDA argues that FLPMA's general requirement that an RMP "provide by tracts or areas for the use of the public lands" compels a grazing suitability analysis during the RMP process.  43 U.S.C. § 1712(a).

Second, ONDA alleges that BLM failed to determine what public lands within the planning area remain "chiefly valuable" for livestock grazing or the production of forage crops, in violation of FLPMA and the TGA.  ONDA argues that by granting BLM the authority to create, enlarge, or modify grazing districts on public lands that "are chiefly valuable for grazing and raising forage crops," and to "examine and classify" lands that are more suitable for other uses, 43 U.S.C. § 315, the TGA requires BLM to make a "chiefly valuable" classification during the RMP process so that the public can assess whether BLM is permitting grazing on lands that are best suited for it.  ONDA also relies on BLM's authority under FLPMA to modify or terminate an existing classification of land.  Id. §§ 1701(a)(3), 1712(d).

BLM first argues that these claims are barred as unripe for

34 - OPINION AND ORDER

review under the Supreme Court's decision in <u>Ohio Forestry Ass'n v.</u>
<u>Sierra Club</u>, 523 U.S. 726 (1998).[7]  In <u>Ohio Forestry</u>, the Sierra
Club challenged a land management plan under the National Forest
Management Act (NFMA) on grounds that the plan improperly favored
logging and clearcutting.[8]  <u>Id.</u> at 731.  In determining whether the
Sierra Club's claims were ripe for review, the Court applied a
three-part analysis: (1) whether delayed review of the claims would
cause hardship to the plaintiffs; (2) whether judicial intervention
would inappropriately interfere with further administrative action;
and (3) whether the Court would benefit from further factual
development.  <u>Id.</u> at 733.

The Court found that delaying consideration of the Sierra
Club's claims until the implementation of site-specific actions
would not cause undue harm.  <u>Id.</u> at 733.  The Court noted that the
management plan did not authorize logging at specific sites or
particular methods of timber harvest; rather, the Forest Service
was required to conduct a site-specific approval process to
authorize individual logging projects, and the Sierra Club could
raise its claims then.  <u>Ohio Forestry</u>, 523 U.S. at 734-35.  Next,

_____

[7] BLM also argues that ONDA's grazing claims are not
justiciable under <u>SUWA</u>, because ONDA cannot compel BLM to take
discretionary action, such as suitability and chiefly valuable
determinations, under § 706(1) of the APA.  While I agree, as
discussed above, ONDA also brings claims under § 706(2)(A) to set
aside a "final agency action" that are justiciable.

[8] A management plan under NFMA is akin to an RMP under
FLPMA.  <u>Kern</u>, 284 F.3d at 1070.

the Court noted that judicial review of logging and clearcutting at
the management plan level could hinder the Forest Service's efforts
to refine its policies and implement site-specific decisions.  Id.
at 735.  Finally, the Court emphasized that review of the Sierra
Club's claims would require "time-consuming judicial consideration
of the details of an elaborate, technically-based plan which
predicts consequences that may affect many different parcels of
land in a variety of ways, and which effects themselves may change
over time."  Id. at 736.[9]

BLM argues that, like the management plan at issue in Ohio
Forestry, the Andrews-Steens RMP designates areas of land available
for grazing but that a site-specific permitting process is
required to authorize actual on-the-ground grazing.  ONDA counters
that the present case is distinguishable from Ohio Forestry,
because the RMP establishes specific land allocations for grazing
and prescribes grazing practices and standards to be utilized in
the allotments.  ONDA does not dispute that BLM can adjust the
specific terms and conditions via grazing permits, but argues that
- by setting the upper limits for management of grazing in the

---

[9] The Court refused to consider Sierra Club's argument that
the plan permitted concrete harms such as opening trails to
motorcycle or heavy machinery use without any analysis of their
impact on wilderness, finding that the Sierra Club failed to
allege these harms in its complaint.  Ohio Forestry, 523 U.S. at
738.  The Court suggested that if the plaintiffs had initially
alleged these types of harm stemming from the plan's approval,
the ripeness analysis would be significantly different and the
case likely justiciable.  Id. at 738-39.

project area - the RMP's grazing allocations constitute a concrete impact.

Although the Andrews-Steens RMP comes closer to authorizing on-the-ground impacts by determining where and how grazing activities can occur in the planning area, I agree that <u>Ohio Forestry</u> precludes ONDA's grazing suitability claims because the RMP does not in and of itself authorize grazing in any specific allotment. In the RMP, BLM defers site-specific grazing decisions to Allotment Management Plans, individual permits, or other site-specific determinations which are subject to further NEPA review, administrative appeal, and subsequent judicial review. Further, I am not persuaded by ONDA's argument that actual impacts have already occurred through 34 grazing permits issued by BLM. ONDA's claims are against the general grazing scheme in the RMP, rather than the impacts of site-specific grazing decisions.

Additionally, I find that court intervention at this stage could interfere with BLM's ability to meet its statutory obligations and implement site-specific decisions, and that the court would benefit from site-specific factual development before considering whether grazing allotments remain suitable or chiefly valuable. Therefore, these claims are not ripe for review at the RMP stage. <u>See</u> <u>Oregon Natural Desert Ass'n</u>, 2005 WL 711663, *5 ("[P]laintiffs' claims under FLPMA and the Taylor Grazing Act are not justiciable, [because the challenged management plan] does not

37 - OPINION AND ORDER

authorize specific actions that could harm plaintiffs.") (citing Ohio Forestry, 532 U.S. at 733).[10]

Even if Ohio Forestry did not apply, ONDA presents no authority that BLM must make grazing suitability or chiefly valuable determinations when developing an RMP. Rather, the cited provisions of PRIA, TGA and FLPMA are general management requirements. BLM has discretion to identify areas available for grazing in the RMP, while deferring grazing suitability determinations to site-specific, allotment-level decisions.

Further, though not required by FLPMA or PRIA, the record demonstrates that BLM assessed grazing suitability of the planning area in the 1960s to determine the forage capacity for livestock and wildlife, and in 1979 supplemented this information with surveys of sections of the RMP planning area. AR 27250. Additionally, BLM can adjust AUM levels in the future if information suggests the chosen alternative is not working. Oregon Natural Desert Ass'n, 2005 WL 711663, *3.

While BLM admits that it last made chiefly valuable

---

[10] ONDA also cites Center for Biol. Diversity v. United States Forest Serv., 450 F.3d 930 (9th Cir. 2006) for the proposition that a definitive statement of an agency's position is an agency action ripe for review. However, in concluding the case was ripe for review, the court noted that the action - approval of incidental take under the Endangered Species Act - created a legal right that would have direct and immediate effects on the parties. Id. at 940. Here, in contrast, approval of the RMP does not create any legal rights. Further, the court considered the three factors identified in Ohio Forestry and determined that the claims were ripe for review. Id. 940-41.

determinations after the TGA was implemented in the 1930s, no authority requires BLM to revisit its original chiefly valuable classifications during an RMP process.  BLM's reclassification of the public lands is expressly discretionary, and neither TGA and FLPMA require BLM to modify or terminate land classifications as part of the RMP process.  As a practical matter, BLM notes that even if an area is not classified as "chiefly valuable" for grazing or is not included within a grazing district, BLM may permit grazing on that land through a grazing lease.  Accordingly, I find that any failure of BLM to analyze whether the grazing allocations in the Andrews-Steens RMP remain suitable or chiefly valuable for grazing does not render the RMP arbitrary or capricious.

## IV.  **Transportation Plan Under the Steens Act**

Finally, ONDA claims that BLM's transportation plan and route designations in the CMPA RMP fail to meet the explicit requirements of the Steens Act.[11]  The Steens Act was enacted on October 30, 2000.  Pub. L. 106-399, 114 Stat. 1655.  Sections 111(b) and 112(a) of the Steens Act require BLM to include a transportation plan in the RMP governing the CMPA:

> *Within four years after the date of the enactment of this Act*, the Secretary shall develop a comprehensive plan for the long-range protection and management of the Federal lands included in the Cooperative Management and Protection Area, including the Wilderness Area.

---

[11] The Steens Act claims in Claim Six pertain only to the CMPA and not the AMU.

39 - OPINION AND ORDER

\*\*\*

> The management plan *shall include*, *as an integral part*,
> a *comprehensive transportation plan* for the Federal lands
> included in the Cooperative Management and Protection
> Area, which *shall address the maintenance, improvement,
> and closure of roads and trails as well as travel access*.

16 U.S.C. §§ 460nnn-21(b), 460nnn-22(a) (emphasis added). As the
Steens Act was enacted on October 30, 2000, BLM was required to
complete a comprehensive transportation plan as an integral part of
the CMPA RMP by October 30, 2004.

ONDA maintains that BLM failed to complete the transportation
plan by the statutory deadline and seeks to compel completion of
the plan under § 706(1) of the APA.  Alternatively, ONDA argues
that the so-called transportation plan in the CMPA RMP is not
comprehensive or integral and should be set aside as arbitrary,
capricious, and not in accordance with law under § 706(2).[12]  BLM
responds that the CMPA RMP contains a comprehensive transportation
plan that meets the requirements of the Steens Act by addressing
the maintenance, improvement, and closure of roads and ways.

The transportation plan referred to by BLM is comprised of the
"Transportation and Roads" section of the CMPA RMP, Appendix M, and
in Maps 11-13.  The Transportation and Roads section summarizes a
goal ("Provide travel routes to and through BLM-managed lands as

---

[12] Amicus Curiae Steens Mountain Landowner Group challenges
ONDA's standing to bring this claim.  However, the federal
defendants, who are parties at this stage of the proceedings, do
not raise this argument, and therefore I decline to address it.

40 - OPINION AND ORDER

appropriate to meet resource objectives while providing for private and public access needs."), an objective ("Manage roads and ways within the CMPA consistent with the Route Management Categories and Maintenance Levels"), and a rationale emphasizing the need for management and protection of natural resources and a route system to accommodate public and private access needs.  CMPA RMP, p. 61-62.  In this section BLM also sets forth maintenance levels for certain routes, and briefly identifies the methods, measurements, and criteria for monitoring roads.  Id. at p. 62-63.  It further states:

> Section 112 also calls for development of a comprehensive [Transportation Plan] for the CMPA and *Appendix M meets this legislative requirement*.  Routes specifically addressed by name will need no further analysis.  An EA/Travel Plan based on specific field inventories and need determinations of all other routes within the CMPA *will complete the comprehensive requirements and be completed by December 31, 2005.*

Id. at p. 62 (emphasis added).

Appendix M is composed of eight pages entitled "Transportation Plan."  Like the CMPA RMP, Appendix M states that an EA/Travel plan based on field inventories and determinations of unknown routes will fulfill the "comprehensive requirements [of the Steens Act] and be completed by December 31, 2005."  Appendix M, p. 1.  Appendix M further provides:  "In the interim, the open roads and ways shown on Map 13 in the RMP represent the routes known to be historically available for motorized use and shall remain available for such use unless changed through the development of the updated

41 - OPINION AND ORDER

Travel Plan mentioned above." Id. Appendix M includes objectives, descriptions of route types and maintenance levels, management directions for specific routes, a list of Best Management Practices, and a Glossary of Terms.

BLM acknowledges that certain route designations were not fully assessed in Appendix M and were given interim designations in the CMPA RMP. However, BLM argues that it can implement management of known routes described in the existing transportation plan and defer designation of routes that need further analysis to the subsequent "Travel Management Plan," which will provide specific field assessments and determinations for routes not accounted for in Appendix M. ONDA responds that BLM's deferral of certain route designations to a later planning process violates the Steens Act's requirement that the BLM develop a "comprehensive and integral" transportation plan as part of the CMPA RMP." ONDA also emphasizes that, aside from the glossary of terms, the CMPA RMP and Appendix M do not address the maintenance, improvement, and closure of trails and related travel access as required by the Steens Act.[13]

As a threshold matter, BLM alleges that ONDA cannot seek to compel agency action under § 706(1) of the APA because it has taken the required action and developed a transportation plan as set

---

[13]In Claim Seven, ONDA argues that the failure to prepare a comprehensive transportation plan also violates NEPA and FLPMA. However, for the reasons explained regarding ONDA's wilderness claims, I find no violation.

forth in Appendix M.  See SUWA, 542 U.S. at 64-65.  ONDA responds that what BLM promulgated as its transportation plan is patently deficient, and therefore BLM has failed to take discrete action required by law.  Thus, ONDA maintains that its § 706(1) claim is justiciable under the standard set forth in SUWA.

I find that BLM's alleged failure to develop a comprehensive transportation plan constitutes action not in accordance with law, rather than action unlawfully withheld.  See Ecology Ctr. v. United States Forest Serv., 192 F.3d 922, 926 (9th Cir. 1999) (The Forest Service's failure to file detailed and extensive monitoring reports within the timeframes required was not a failure to act, but rather a failure to perform its duty in "strict conformance" with the applicable statute).  BLM has developed what it deems the "transportation plan" in the CMPA RMP and Appendix M; therefore, I find no absolute failure to act.  ONDA's Steens Act claim is justiciable under § 706(2) of the APA.

The Steens Act plainly and unambiguously imposes a mandatory duty on BLM to complete a "comprehensive" transportation plan as an "integral" part of the RMP by October 2004.  Though BLM claims that its transportation plan "provides details on the various components of the transportation management system," it merely includes a goal, an objective, designation of certain known routes, a list of 35 "Best Management Practices," and a glossary of terms to guide management of transportation aspects over 496,000 acres of federal

43 - OPINION AND ORDER

land.  It does not include a comprehensive management system for travel over roads, ways, and trails.  Further, the transportation plan itself provides that an additional Environmental Assessment and "Travel Management Plan" is required "to complete the comprehensive transportation plan" after further field inventories and need determinations are conducted:

> Management actions within this [Transportation Plan] pertain only to the currently mapped routes.  Other routes are known to exist; however, the exact location and uses of most of these routes are not currently known. Once these unmapped routes are inventoried, an EA/Travel Plan will be prepared to determine if they should be added to the transportation system, converted to hiking trails, or closed and rehabilitated.

Appendix M, p. 1.  It is therefore difficult to view the transportation plan in Appendix M as "comprehensive" or "integral."

Moreover, the CMPA RMP and Appendix M do not describe or include a plan for managing different types of travel over specific areas, roads, routes or trails.  Aside from a definition of "trail density" in its glossary of terms, the transportation plan fails to address travel on hiking trails as is unambiguously required by the statute.  BLM emphasizes that hiking trails are addressed in other parts of the RMP and also in the Steens Mountain Wilderness and Wild and Scenic Rivers Plan, a separate management plan that addresses the Steens Mountain Wilderness and designated Wild and Scenic Rivers within the CMPA.  However, the essential elements of the transportation plan, as set forth in the Steens Act, must be an integral part of the RMP.

44 - OPINION AND ORDER

BLM argues that, despite these gaps, its transportation plan meets the requirements of the Steens Act by addressing maintenance, improvement, and closure of routes as well as travel access.  BLM argues that the Steens Act does not expressly require the agency to conduct a field examination of every possible route during the RMP process, and that BLM has discretion to institute specific management criteria for routes of known condition and use and interim direction for routes that require further assessment.

While BLM is correct that it can, and must, supplement its transportation plan with future relevant information, see 16 U.S.C. § 460nnn-21(b), I find that the Steens Act requires BLM to do more than simply describe the components or criteria of a future plan and defer development of the transportation plan to a later planning process.  BLM's approach violates the express intent of Congress, as set forth in the Steens Act, that BLM complete a comprehensive transportation plan integral to the CMPA RMP by the statutory deadline.

Finally, BLM argues that its interpretation of the Steens Act's requirement of a comprehensive transportation plan is entitled to deference under Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837 (1984).  However, I find it questionable whether Chevron applies.  It is the district court's duty to independently review the agency's decision under § 706(2) to determine whether BLM's actions are arbitrary, capricious, or not

45 - OPINION AND ORDER

in accordance with law.  See Oregon Natural Res. Council Fund v. Brong, No. 04-693-AA, slip op. at 46 (D. Or. Nov. 8, 2004).

Even if Chevron and its progeny were to apply, BLM is not entitled to the deference it seeks.  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43.  Unless otherwise defined, words are interpreted as taking their "ordinary, contemporary, common meaning."  The Wilderness Soc'y v. United States Fish & Wildlife Serv., 353 F.3d 1051, 1060 (9th Cir. 2003) (citations omitted).  BLM does not argue that the terms "comprehensive" and "integral" are ambiguous.  Rather, BLM argues that the statute is silent as to the level of detail required within the plan.  However, the minimal level of detail is provided by the statutory language; i.e., the plan must be "comprehensive" and an "integral part" of the CMPA RMP.  Applying the ordinary meaning of these terms, the transportation plan must be "inclusive and embracing" and necessary to the completeness or integrity of the RMP as a whole.  see The Oxford English Dictionary Vol. VII, at pp. 632, 1063 (Second Ed. 1989) (definitions of "comprehensive" and "integral").  Because BLM's transportation plan fails to address significant components, it is not comprehensive or integral under the ordinary meaning of those terms.  Thus, I find that BLM's transportation plan is arbitrary, capricious, and not in accordance

46 - OPINION AND ORDER

with the Steens Act.

During oral argument, however, counsel for defendants indicated that BLM was nearing completion of the "Travel Management Plan" that will include a comprehensive analysis of travel across roads, ways, and trails.  On April 15, 2007, BLM issued the Steens Mountain Travel Management Plan (TMP)/Environmental Assessment(EA) and a Finding of No Significant Impact.  Plaintiff's Notice of Factual Development, Attachment A, p. 1.  BLM solicited public comments on the TMP/EA until May 21, 2007.  Id.  On May 31, 2005, BLM issued a Decision Record that proposes to adopt the TMP/EA.  If no interested party appeals the Decision Record within 15 days, it will become final.  If it is appealed, it will become final upon resolution of the protests.  See Defendants' Response to 06/01/07 Order.

As it is not yet a final agency action, the TMP/EA is not subject to judicial review, and ONDA's Steens Act claim is limited to the transportation plan of record.  Therefore, I find no reason to stay issuance of this Opinion and Order.  To the extent the TMP/EA becomes relevant in the remedial phase or in future motions, I will address it at that time.

CONCLUSION

For the reasons given above, ONDA's motion for partial summary judgment on Claim Six (doc. 17) is GRANTED, and ONDA's motion for summary judgment on all remaining claims (doc. 110) is DENIED.

47 - OPINION AND ORDER

Intervenor Center for Tribal Water Advocacy's ("CTWA") motion for summary judgment (doc. 115) is GRANTED with respect to its Steens Act claim, and DENIED in all other respects.  Defendants' cross-motion for summary judgment with respect to CTWA (doc. 150) and cross motion for summary judgment with respect to ONDA (doc. 131) are DENIED as to Claim Six and granted in all other respects.
IT IS SO ORDERED.

     Dated this ___8___ day of June, 2007.


_____/s/ Ann Aiken_____
Ann Aiken
United States District Judge

48 - OPINION AND ORDER